IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| DANNY RAY MARKS, JR., *et al.*, | ) | |
|     Plaintiffs, | ) | |
| | ) | |
|     v. | ) | Civil No. 3:14-cv-25 (DJN) |
| | ) | |
| SCOTTSDALE INSURANCE | ) | |
| COMPANY, | ) | |
|     Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This case requires the Court to construe the language of an insurance policy to determine whether the policy covers a member of a hunt club who allegedly discharged his firearm negligently while hunting, resulting in bodily injury to the driver of a vehicle on a nearby public road. Both the shooter and the injured driver seek a declaratory judgment that the policy covers the shooter. The insurance company that issued the policy opposes coverage, arguing that the hunt club member's allegedly negligent shooting neither occurred during a hunt club activity nor constituted an activity performed on behalf of the hunt club, as required for coverage under the policy.

The parties have filed cross-Motions for Summary Judgment (ECF Nos. 30, 32, 34), and the matter is ripe for review.[1] Because the Court finds that no dispute of material fact exists and agrees with Defendant Scottsdale Insurance Company, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 34) and DENIES Plaintiffs' Motions for Summary Judgment (ECF Nos. 30, 32).

---

[1]    The parties come before the Court by consent pursuant to 28 U.S.C. § 636(c)(1).

## I.    BACKGROUND

On January 3, 2013, Plaintiff Timothy B. Johnson ("Johnson") went hunting at land leased by the Northumberland Hunt Club ("Hunt Club") in Richmond County, Virginia. At one point, a deer jumped out, giving Johnson an opportunity to take a shot. Johnson fired his shotgun at the deer. At the same time, Plaintiff Danny Ray Marks, Jr. ("Marks") drove along Route 642, a route that lay in Johnson's line of fire. One of the pellets from Johnson's shotgun spray struck Marks, causing him bodily injury. On July 1, 2013, Marks commenced a separate suit against Johnson and the Hunt Club in the Richmond County Circuit Court, alleging that Johnson's negligence and the Hunt Club's negligence proximately caused Marks' bodily injury.

Defendant Scottsdale Insurance Company ("Defendant") issued to the Hunt Club a commercial insurance policy to insure the Hunt Club for damages caused by bodily injury. The policy contains an additional endorsement protecting Hunt Club members from liability for Hunt Club activities or activities performed on behalf of the Hunt Club. On December 16, 2013, Marks filed this declaratory judgment action, seeking a declaration that the policy provided coverage for Johnson in Marks' separate, liability suit against Johnson and the Hunt Club.[2]

Little dispute exists between the parties as to the underlying facts, such as whether Johnson was a member of the Hunt Club at the time of the incident. Instead, the parties debate whether the language of the endorsement is ambiguous and whether the Policy provides coverage to Johnson. Marks and Johnson (collectively "Plaintiffs") argue that the endorsement is ambiguous and, therefore, the Court should construe the policy against Defendant and in favor of coverage. Plaintiffs alternately argue that the policy covers Johnson's actions as his liability

---

[2]    Marks originally named only Defendant as party to this suit. Defendant timely removed the action to this Court and sought to join Johnson as a party. The Court then joined Johnson as a party plaintiff in the matter. (Order (ECF No. 29).)

stemmed from a Hunt Club activity, because Johnson was hunting on land leased by the Hunt Club and with other Hunt Club members at the time of the incident. Defendant asserts that the language is unambiguous and that Johnson's potential liability arose from his own voluntary activities — not those of the Hunt Club nor those performed on behalf of the Hunt Club — and, therefore, the endorsement does not extend to cover Johnson's liability.

## II.   UNDISPUTED MATERIAL FACTS

The Court has reviewed each party's statement of undisputed facts, including the extensive supporting documentation filed in support of their respective positions. Pursuant to Local Rule 56(B), "[e]ach brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue." E.D. Va. Loc. R. 56(B). Further, any "brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated." E.D. Va. Loc. R. 56(B). In ruling on the motion for summary judgment, the Court "may assume that facts identified by the moving party in its listing . . . are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition." E.D. Va. Loc. R. 56(B). Accordingly, the Court has concluded that the following narrative represents the undisputed, material facts for purposes of resolving the cross-motions for summary judgment.

### A.  The Hunt Club

The Hunt Club exists "[t]o provide [an] opportunity for members to collectively work together to enjoy [a] safe environment for hunting" in Virginia's Northern Neck region. (Mem. of Fact and Law in Supp. of Johnson's Mot. for Summ. J. ("Johnson's Mem.") (ECF No. 31), Ex. 3 Northumberland Hunt Club By-Laws ("By-Laws") (ECF No. 31-3) ¶ I.A.; *see also* T.

3

Vaden Warren Jr.'s Decl. Supporting Marks' Summ. J. Mot. ("Warren Decl.") (ECF No. 33),

By-Laws (ECF No. 33-3); Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 36),

Ex. D By-Laws (ECF No. 36-4).)[3]   The Hunt Club, as an entity, operates as an unincorporated

association. (Def.'s Mem. at 5.)[4]   To become a member of the Hunt Club, an active member

must recommend an individual, and the members must approve that individual by a majority-

vote. (By-Laws ¶¶ V.A.-C.)  Further, to maintain membership, a member must pay monthly

dues payments and yearly land fees. (By-Laws ¶¶ VI.A.-B.)  Other "informal" requirements

included selling raffle tickets and participating in workdays to improve land that the Hunt Club

owned or leased. (Johnson's Mem., Ex. 4 Dep. of Roland M. McIver ("McIver Dep.") (ECF No.

31-4) 21:7-22:2, May 27, 2014.)[5]

The Hunt Club had officers, including a President, a Treasurer, two Business Managers

and a Building Manager, among others. (By-Laws ¶ II.A.)  The By-Laws tasked the individuals

in these roles with certain responsibilities.  The President presided over meetings and represented

the Hunt Club in matters relating to Hunt Club business. (By-Laws ¶ II.C.)  The Treasurer kept

financial records, including paying bills. (By-Laws ¶ II.C.)  Business Managers managed land

that the Hunt Club leased and developed plans for generating money to support the Hunt Club's

activities and holdings. (By-Laws ¶ II.C.)  The Building Manager maintained the clubhouse and

Hunt Club property.  (By-Laws ¶ II.C.)

---

[3]     Plaintiffs and Defendant have attached several of the same documents in support of their
respective motions for summary judgment.  The Court will cite only to one, but footnote to the
other parties' attachments.

[4]     Because Plaintiffs did not dispute this fact in their opposition briefs, the Court assumes
that the Plaintiffs admit that this fact is undisputed. E.D. Va. Loc. R. 56(B).

[5]     Warren Decl., McIver Dep. (ECF No. 33-4); Def.'s Mem., Ex. C McIver Dep. (ECF No.
36-3).

The Hunt Club owned real property and maintained a cinder-block building there, where the Hunt Club held meetings.  (Def.'s Mem., Ex. E, Dep. of Timothy B. Johnson ("Johnson Dep.") (ECF No. 36-5) 39:5-15, May 12, 2014.)[6]  Members and guests usually met there after a successful hunt to skin deer and divvy up the meat, because the By-Laws required that the meat be split.  (Johnson Dep. 35:8-12; By-Laws ¶¶ IV.A.-B.)  Additionally, the Hunt Club leased property so that its members had access to hunt, and the Hunt Club would mark that property to note that members had permission to hunt there.  (Johnson Dep. 35:23-25, 36:1-3; McIver Dep. 25:2-24, 27:3-24.)

Hunt Club members customarily hunted together every Saturday during deer season, and on other days, members made informal arrangements with each other to hunt.  (Johnson Dep. 43:10-20; McIver Dep. 33:1-25, 34:1-24.)  Members could hunt the Hunt Club's land on their own without having to seek permission.  (Johnson Dep. 42:23-25, 43:1-5; McIver Dep. 35:7-15.)  The hunts were completely voluntary, and members did not have to participate as a condition of membership.  (Johnson Dep. 47:17-19; McIver Dep. 35:20-24.)  If a member chose to hunt, he could do so at whatever time he desired and was not required to stay for any length of time.  (Johnson Dep. 55:15-21; McIver Dep. 40:11-24.)  A member could choose to hunt any piece of the land that Hunt Club members had permission to use.  (Johnson Dep. 49:21-25; McIver Dep. 41:4-24.)  Each member supplied his own gun and his own ammunition.  (Johnson Dep. 41:16-20; McIver Dep. 32:17-21.)  Guests could accompany members on hunts for a fee.  (By-Laws ¶ III.)

---

[6]     Warren Decl., Johnson. Dep. (ECF No. 33-5).

B. The Insurance Policy

Defendant issued to the Hunt Club commercial policy number CPS 1658644, effective between November 2012 and November 2013. (Johnson's Mem., Ex. 2 ("Policy") (ECF No. 31-2) at 3.)[7] The Policy designated the named insured as the Hunt Club and provided the Hunt Club coverage for liability for bodily injury up to $1,000,000. (Policy at 8, 12.) An additional endorsement ("Endorsement") modified the Policy to include members of the club as insureds under the Policy. (Policy at 27.) The Endorsement specifically provided that "WHO IS AN INSURED (Section II) is amended to include as an insured any of your members, but only with respect to their liability for your activities or activities they perform on your behalf." (Policy at 27.)

C. Johnson's Club Involvement

Johnson had been a member of the Hunt Club for over twenty years and was a member on January 3, 2013 — the date of the incident. (Johnson Dep. 16:7-8, 17:24-18:2; McIver Dep. 18:19-22.) Johnson's involvement with the club mainly involved hunting. (Johnson Dep. 18:5-6.) He paid regular dues and occasionally sold raffle tickets for the Hunt Club. (Johnson Dep. 22:19-20; McIver Dep. 20:6-7, 23-25.) The Hunt Club sometimes held dances, but Johnson had not attended one in several years. (Johnson Dep. 26:20-21.) Johnson had not participated in Hunt Club workdays since about 2010 or 2011, but he provided materials that the Hunt Club used for those workdays. (Johnson Dep. 27:8-24.) Although Johnson previously served as President and Treasurer of the Hunt Club, on January 3, 2013, he was no longer an officer of the Hunt Club. (Johnson Dep. 30:20-31:1, 32:6-9.)

---

[7]      Warren Decl., Policy (ECF No. 33-2); Def.'s Mem., Ex. A Policy (ECF No. 36-1). The Policy contains several different parts with separate pagination sequences. Accordingly, for ease of reference, the Court will cite to the page number that the ECF header generated in ECF No. 31-2.

D.  Incident

On the day before the incident, members of the Hunt Club called Johnson to let him know where they would be hunting the following day. (Johnson Dep. 51:6-23.) Johnson joined their hunt, because he did not have to work. (Johnson Dep. 51:10-12, 52:14-15.) On January 3, 2013, approximately seven members and two guests arrived to hunt. (McIver Dep. 39:21-24.) The members and guests hunted property adjacent to Johnson's family's property. (Johnson Dep. 33:8-14, 36:14-16.) The Hunt Club leased that property. (Johnson Dep. 33:21-25, 37:2-4.)

Johnson brought his own gun and his own ammunition. (Johnson Dep. 9:22-24; 10:15-21.) Johnson originally hunted in one location, but he later moved and met up with a friend and fellow club member, Mike Gaines. (Johnson Dep. 54:7-16.) Thereafter, a deer appeared and Johnson fired a shot at the deer. (Johnson Dep. 55:25-56:6.) The shot travelled in the direction of Route 642 in Richmond County, Virginia. (Warren Decl., Ex. B Compl. ("Liability Suit Compl.") (ECF No. 33-2) ¶¶ 15-16.) Marks drove by as Johnson fired the shot. (Liability Suit Compl. ¶ 17.) A pellet from the shot that Johnson fired struck Marks' car, and another pellet struck Marks in the head, causing him bodily injury. (Liability Suit Compl. ¶¶ 18-19.) As a result of the incident, law enforcement cited Johnson but not the Hunt Club. (Johnson Dep. 57:2-7.)

E.  Lawsuits

As a result of the incident, Marks filed a negligence suit against Johnson and the Hunt Club. In the underlying suit, Marks brought claims of negligence, gross negligence and punitive damages against Johnson. (Liability Suit Compl. ¶¶ 20-22, 29-31.) Marks also brought a negligence claim against the Hunt Club. (Liability Suit Compl. ¶¶ 22-28.)

On December 16, 2013, Marks brought this suit for declaratory judgment against Defendant in Richmond County Circuit Court, seeking a declaration that the Endorsement covered Johnson. (Compl. (ECF No. 1-1) ¶ 7.) Defendant timely removed the action from Richmond County Circuit Court to this Court pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. (Notice of Removal (ECF No. 1).)

Defendant then moved to join Johnson as a party plaintiff, because Johnson had an interest in the outcome of this declaratory judgment action. (Mot. for Joinder (ECF No. 12).) Both Johnson and Marks consented to Johnson's joinder as a party plaintiff. (ECF Nos. 27, 28.) Because all parties consented and doing so did not deprive the Court of jurisdiction, the Court joined Johnson as a party plaintiff. (Order (ECF No. 29) at 1.)

### III. STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a court may appropriately grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that

motion." *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

When considering a case for summary judgment, the Court cannot weigh the evidence to enter a judgment, but simply must determine if a genuine issue exists for trial. *Greater Balt. Ctr. for Pregnancy Concerns v. Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013). Even on cross-motions for summary judgment, a court cannot resolve factual issues, it can only identify them. *Id.* (citing *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. 247-48. A material fact consists of one that might affect the outcome of a party's case. *Id.*; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 246 F.3d 459, 465 (4th Cir. 2001).

## IV. DISCUSSION

Plaintiffs seek a judgment pursuant to 28 U.S.C. § 2201 from this Court declaring that Defendant's insurance policy issued to the Hunt Club provided coverage to Johnson.[8] Because the Court's jurisdiction arises from diversity of citizenship under 28 U.S.C. § 1332, the Court

---

[8]     Marks initially brought this suit in state court seeking a declaration pursuant to Virginia Code § 8.01-184. Defendant removed this suit from state court to federal court pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. The Fourth Circuit treats state court declaratory judgments that the parties remove to federal court as invoking the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n.3 (4th Cir. 2013) (citing *Jones v. Sears Roebuck & Co.*, 301 F. App'x 276, 281 n.12 (4th Cir. 2008)).

The Federal Declaratory Judgment Act, however, only creates this remedy for "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). The court, therefore, must have jurisdiction over the matter, independent of the remedy. In this case, Plaintiffs are both citizens of Virginia and Defendant maintains citizenship in Arizona and Ohio. The Policy would provide coverage of damages sustained by Marks of at least $100,000. Accordingly, because the litigants are diverse and the amount in controversy exceeds $75,000, this Court maintains jurisdiction pursuant to 28 U.S.C. § 1332 and may enter a declaratory judgment under 28 U.S.C. § 2201.

must first determine which substantive law to apply to the facts of the case. After that determination, the Court then will address Plaintiffs' contention that the language of the Policy is ambiguous. Finally, the Court will address Plaintiffs' argument that if the Policy language is not ambiguous, the Endorsement applies to Johnson, triggering coverage and a duty to defend Johnson by Defendant.

### A. Choice of Law

Because the Court's jurisdiction is based on diversity, the Court must apply the choice of law rules of Virginia as the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1937); *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 100 (4th Cir. 2013) (citing *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418-19 (4th Cir. 2004)). For choice of law purposes, "Virginia insurance law applies the law of the place where the insurance contract is written and delivered." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 158 (4th Cir. 2009) (quoting *Buchanan v. Doe*, 246 Va. 67, 70-71, 431 S.E.2d 289, 291 (1993)) (internal quotation marks omitted) (applying Virginia law). Defendant issued and delivered the Policy to the Hunt Club in Virginia. (Def.'s Mem. at 14 n.1.) Accordingly, Virginia law applies.

### B. Ambiguity

Plaintiffs argue that at a minimum the Policy's language is ambiguous; therefore, the Court should construe that language against Defendant, resulting in coverage for Johnson. (Johnson's Mem. at 6.) Defendant responds that the Policy's language is not ambiguous and asks that the Court apply the Policy's clear language in declaring that the Policy does not afford Johnson coverage. (Def.'s Mem. at 20-22; Scottsdale's Mem. in Opp'n to Mots. for Summ. J. Filed by Marks and Johnson ("Def.'s Opp'n") (ECF No. 43) at 8-9.)

Under Virginia law, "[c]ourts interpret insurance policies . . . like other contracts." *TravCo Ins. Co. v. Ward*, 284 Va. 547, 553, 736 S.E.2d 321, 325 (2012).  The words used in the policy are given "their ordinary and usual meaning when they are susceptible of such construction." *State Farm Fire & Cas. Co. v. Walton*, 244 Va. 498, 502, 423 S.E.2d 188, 191 (1992) (citation omitted).  Courts must "construe the contract as a whole, and no word or clause is to be treated as meaningless if any reasonable meaning consistent with the other parts of the contract can be given to it." *Hutter v. Heilmann*, 252 Va. 227, 231, 475 S.E.2d 267, 270 (1996) (citations and internal quotation marks omitted); *see also Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 2013) (noting that courts must analyze ERISA plans like contracts and as a whole to determine a provision's meaning in context of entire agreement).  If the terms are unambiguous, the court need not apply any other rules of construction. *Va. Farm Bureau Mut. Ins. Co. v. Hodges*, 238 Va. 692, 696, 385 S.E.2d 612, 614 (1989).  Accordingly, when construing an insurance policy under Virginia law, words are given their ordinary and reasonable meaning in light of the contract as a whole. *CACI Int'l, Inc.*, 566 F.3d at 158.

If the language is ambiguous, "[t]he rule of construction consistently applied in [Virginia] is that ambiguous language in insurance policies must be interpreted most strongly against the scrivener and in favor of the insured," because the insurer drafts the policy and controls coverage. *Cuna Mut. Ins. Soc'y v. Norman*, 237 Va. 33, 36, 375 S.E.2d 724, 725 (1989) (citations omitted); *see also Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va.*, 715 F.3d 501, 517 (4th Cir. 2013) (applying Virginia and North Carolina law and noting that the principle of *contra proferentem* requires courts to construe ambiguities in contracts against drafter).  "A term is ambiguous if, to a reasonably prudent person, the term is susceptible of more than one meaning.  A term is not ambiguous simply because the parties disagree about the meaning."

*Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 792 (E.D. Va. 2001). Courts should refrain from creating ambiguity where none exists. *Id.* at 793.

Plaintiffs allege ambiguity in the Endorsement — the section of the Policy under which Johnson claims coverage. The Endorsement modifies the original "Who Is An Insured" section of the Policy. It states: "WHO IS AN INSURED (Section II) is amended to include as an insured any of your members, but only with respect to their liability for your activities or activities they perform on your behalf." (Policy at 27.)

At least two other courts have found identical language to the Endorsement as not ambiguous. *See Everett Cash Mut. Ins. Co. v. Ins. Corp. of Hanover*, 2008 WL 4453113 (M.D. Pa. Sept. 30, 2008); *Lenox v. Scottsdale Ins. Co.*, 2005 WL 1076065 (D.N.J. May 5, 2005). In *Everett Cash Mutual Insurance Co. v. Insurance Corp. of Hanover*, David Cupp was a member of a hunt club in Pennsylvania. 2008 WL 4453113, at *1. Cupp's hunt club maintained a commercial insurance policy with an endorsement identical to the Endorsement at issue here. *Compare id.* at *1 & n.4, *with* (Policy at 27). In seeking coverage under the endorsement for a hunting accident, Cupp argued that the language of the endorsement was ambiguous. *Everrett Cash*, 2008 WL 4453113, at *5. The Court rejected the argument, because "[t]he phrase, 'your activities,' is straightforward and simple to comprehend . . . . Club activities are those actions taken by the Club in its capacity as a[n] . . . entity." *Id.* at *5.[9]

Similarly, in *Lenox v. Scottsdale Insurance Co.*, Robert Lenox was a member of a beach club that maintained commercial insurance coverage through Scottsdale Insurance Company.

---

[9]     The law required that the Court enforce clear contract language. *Everrett Cash*, 2008 WL 4453113, at *3 (citing *401 Fourth Street, Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)). Virginia law similarly requires that courts enforce the terms of an insurance policy as written. *State Farm Fire & Cas. Co.*, 244 Va. at 502, 423 S.E.2d at 191.

2005 WL 1076065, at *1. The beach club's insurance policy contained an endorsement identical to the one that the Hunt Club's policy contained. *Compare id.*, *with* (Policy at 27). In interpreting the endorsement, the court found that the language was not ambiguous, because the phrases "your activities" and "activities they perform on your behalf" were not confusing, but rather "simple and easy to understand." *Lenox*, 2005 WL 1076065, at *3.[10] Accordingly, the court declined to construe the language to create an ambiguity where none existed. *Id.*

In this case, the Declarations section of the Policy lists the Hunt Club as the Named Insured. (Policy at 3.) The Commercial General Liability Coverage Form of the Policy states: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." (Policy at 10.) As such, "the Hunt Club" may replace the pronouns "you" and "your" in the Endorsement. The Endorsement then reads: "WHO IS AN INSURED (Section II) is amended to include as an insured any of [the Hunt Club's] members, but only with respect to their liability for [the Hunt Club's] activities or activities they perform on [the Hunt Club's] behalf."

Further, the endorsement contains the pronouns "their" and "they" when referring to the Hunt Club's members. Accordingly, "members" may replace the two pronouns "their" and "they." Having already replaced "you" and "your" with "the Hunt Club," the full endorsement without any pronouns would read: "WHO IS AN INSURED (Section II) is amended to include as an insured any of [the Hunt Club's] members, but only with respect to [members'] liability for [the Hunt Club's] activities or activities [members] perform on [the Hunt Club's] behalf."

---

[10]    New Jersey law provided that ambiguity exists "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Lenox*, 2005 WL 1076065, at *3 (quoting *Resolution Trust Corp. v. Fid. & Deposit Co.*, 205 F.3d 615, 643 (3d Cir. 2001)) (internal quotation marks omitted).

First, the phrase "[the Hunt Club's] activities" is straightforward and does not create disparities with text elsewhere in the Policy. Furthermore, the language is simple to comprehend in the context of the Policy as a whole, specifically in the context of the original "WHO IS AN INSURED" section. The endorsement provides coverage for member liability during a Hunt Club activity.

Second, the phrase "activities [members] perform on [the Hunt Club's] behalf" is straightforward and unambiguous. The endorsement provides coverage for member liability when the member acts on the Hunt Club's behalf. Again, the language is straightforward in the context of the Policy as a whole, because the Policy provides coverage to the Hunt Club, and the endorsement contemplates extension of coverage to members when those members act for the Hunt Club.

The Court disagrees with Plaintiffs' efforts to create ambiguity in the plain language of the endorsement, specifically the phrase "your activities." At its core, the parties actually quarrel about the Policy's meaning — specifically scope — not its ambiguity. However, "a term is not ambiguous simply because the parties disagree about the meaning." *Solers*, 146 F. Supp. 2d at 792. And it bears repeating that courts should refrain from straining to create an ambiguity where none exists. *See id.* at 793. Here, the plain language of the Policy and the plain language of the Endorsement are straightforward and unambiguous.

C. Scope of Coverage Under the Policy

Having found the plain language of the Policy and Endorsement to be unambiguous, the Court next addresses the parties' contentions regarding the scope of coverage for Johnson. Plaintiffs argue that Johnson's liability stems from a Hunt Club activity, specifically hunting. (Johnson's Mem. at 6; Marks' Br. in Supp. of His Summ. J. Mot. (" Marks' Mem.") (ECF No.

14

35) at 9-12.) Alternatively, Plaintiffs argue that because any meat would have been split amongst the hunters that day, Plaintiff acted on behalf of the Hunt Club. (Mem. of Fact and Law in Opp'n of Scottsdale Insurance Company's Mot. for Summ. J. ("Johnson's Opp'n") (ECF No. 37) at 4.) As a result of either scenario, Plaintiffs argue that Johnson's actions fall within the scope of the Endorsement, meaning that the Policy covers Johnson and Defendant owes him a duty to defend. (Johnson's Opp'n at 3-4.) Defendant contends that Johnson's liability arises from his own, voluntary actions and neither from Hunt Club activity nor actions on behalf of the Hunt Club. (Def.'s Mem. at 19.) Because Johnson's liability does not arise from Hunt Club activity, the scope of the Endorsement does not capture Johnson's actions; therefore, Defendant has no duty to defend Johnson and the Policy does not cover Johnson's liability. (Def.'s Mem. at 19-20.)

In this case, the Policy insures the Hunt Club against bodily injury to third parties. (Policy at 8.) The Endorsement then modifies the Policy to cover Hunt Club members to the extent that the members are liable for Hunt Club activities or activities that the members perform on the Hunt Club's behalf. (Policy at 27.) Accordingly, for the Policy to cover Johnson for potential liability, Johnson must have been a member of the Hunt Club. If Johnson was a member of the Hunt Club, the Policy would cover him in two specific instances.[11] First, the Policy would cover Johnson "with respect to [his] liability for [the Hunt Club's] activities." Second, the Policy would cover "activities [Johnson] perform[ed] on [the Hunt Club's] behalf."

---

[11]     The unambiguous language of the Endorsement amends the Policy to cover members, "but *only* with respect" to these two, specific instances. (Policy at 28 (emphasis added).) The Policy limits coverage similarly in other instances. (*See, e.g.*, Policy at 18 (limiting coverage for officers and directors "to their duties as [Hunt Club] officers or directors" and for stockholders "to their liability as stockholders" ).)

As an initial matter, the parties do not dispute that Marks suffered bodily injury. (Marks'
Mem. at 3.)[12] Further, the parties do not dispute that at the time of the incident, Johnson was a
member of the Hunt Club. (Johnson's Mem. at 5; Marks' Mem. at 3; Def.'s Mem. at 5.) Rather,
the parties dispute whether the Endorsement affords Johnson coverage as a member for
Johnson's potential negligence that caused Marks' bodily injury.

First, the Court addresses whether the Policy covers Johnson "with respect to [his]
liability for [the Hunt Club's] activities." Second, the Court determines whether the
Endorsement covers Johnson for "activities [Johnson] perform[ed] on [the Hunt Club's] behalf."
Finally, the Court addresses Defendant's duty to defend.

1. Johnson was not participating in Hunt Club activity.

Plaintiffs argue that "hunting" is "not only the purpose of the Northumberland Hunt Club,
but also the main activity of the Northumberland Hunt Club." (Johnson's Mem. at 6.)
Specifically, because Johnson participated in a hunt with other members of the Hunt Club that
day, he participated in the main activity of the Hunt Club, entitling Johnson to coverage.
(Johnson's Opp'n at 3.) Defendant argues that Johnson's actions leading to Marks' injury were
completely voluntary and not part of a Hunt Club activity. (Def.'s Mem. at 20.)

When determining the ordinary and accepted meaning of words in an insurance policy,
"[t]he whole document should be construed in the light of the subject matter with which the
parties are dealing and the words or phrases of the policy should be given their natural and
ordinary meaning." *London Guarantee & Acc. Co. v. C.B. White & Bros.*, 188 Va. 195, 204, 49
S.E.2d 254, 259 (1948); *see also Superformance Int'l., Inc. v. Hartford Cas. Ins. Co.*, 203 F.

---

[12]     Marks listed as an undisputed fact that the incident caused Marks bodily injury. (Marks'
Mem. at 3.) Because Defendant did not dispute this fact, the Court deems that fact as admitted.

16

Supp. 2d 587, 592 (E.D. Va. 2002) (quoting *Solers, Inc.*, 146 F. Supp. 2d. at 789) (applying Virginia law). Where a disputed term is unambiguous, courts apply the plain meaning of the term as written. *Dooley v. Hartford Accident & Indem. Co.*, 716 F.3d 131, 135 (4th Cir. 2013) (applying Virginia law).

Again, the Court notes that at least two other courts have found that identical language extends to members in two, discrete situations. Although from other jurisdictions, the Court finds their interpretations instructive.

In *Everett Cash*, Cupp shot at what he mistakenly thought was a turkey while hunting, but struck Loy Richard Binger in the arm instead. 2008 WL 4453113, at *1. Binger commenced both a liability suit and a declaratory judgment suit. *Id.* at *1-2. In the declaratory suit, the Insurance Corporation of Hanover — Cupp's hunt club's insurance provider — asked that the court declare that Hanover had no duty to defend Cupp and that the policy endorsement did not cover Cupp's actions that day. *Id.* at *1-2. The court found the language unambiguous and found that the phrase "your activities" applied to activities undertaken by the club as an entity. *Id.* at *5. The court noted that under Pennsylvania law, the club's actions as an entity included suing and being sued, participating in judicial proceedings, acquiring and owning real property and borrowing money, among other activities. *Id.* Accordingly, the court found that "[a] member's personal, recreational hunting trip fail[ed] to qualify for inclusion." *Id.* at *6.

Similarly, in *Lenox*, Lenox went to the beach club with others "to enjoy the beach . . . and have a good time." 2005 WL 1076065, at *1 (internal quotation marks omitted). Lenox jumped from a bulkhead at the beach head's property and knocked Andrew Veloce into the water. *Id.* Veloce landed head-first in the water, fracturing his vertebrae. *Id.* Lenox sought a declaration that the endorsement in the beach club's policy covered his liability for injuries that Veloce

17

sustained. *Id.* at *2. Lenox argued that his mere presence at the beach club in furtherance of the

beach club's purpose — to foster a sense of community with other members — constituted beach

club activity. *Id.* at *4. The court declined to extend the scope of beach club activity that far,

because to do so would render the limiting language of the endorsement irrelevant. *Id.* The

court interpreted the scope of the endorsement to cover situations where a member could be held

vicariously liable for some activity that the beach club undertook as an entity. *Id.* The court

rejected Lenox's assertion that the endorsement covered his actions that day, because the

accident occurred between two individuals visiting the club on their own accord and own time.

*Id.* at *5. To find coverage in that instance would have led to coverage for every member

"stepping foot on club property," and that would have been in conflict with the plain

endorsement language at issue. *Id.*

Here, the subject matter of the Policy offers insurance for the Hunt Club as an entity.

(Policy at 8.) The undisputed facts show that the Hunt Club operated as an entity, specifically an

unincorporated association. (Def.'s Mem. at 5.) Virginia law permits an unincorporated

association to sue or be sued under its common name or business name. Va. Code § 8.01-15.

Further, judgments and executions against the unincorporated association bind its real and

personal property. *Id.*

The parties do not dispute that Marks brought suit against the Hunt Club as an entity in a

different suit. (Liability Suit Compl.) Any judgment against the Hunt Club as an entity in that

case could bind its property, including its land and clubhouse. *See* Va. Code § 8.01-15. Indeed,

the Hunt Club owns land with a clubhouse. (Johnson Dep. 39:5-15.) The Hunt Club also leases

land to provide access to its members. (Johnson Dep. 35:23-25, 36:1-3; McIver Dep. 25:2-24,

27:3-24.) The undisputed facts show that the Hunt Club as an entity occasionally held raffles,

dances or fish-fries. (McIver Dep. 20:13-21:6.) The Hunt Club also held workdays during which members would participate in improving land that members hunted. (McIver Dep. 21:7-20.)

Accordingly, "Hunt Club activities" under the Endorsement included activities in which the Hunt Club acts as an entity; for example, suing or being sued, owning or leasing land or holding events such as a meeting, workday or fish-fry.

In contrast, the undisputed facts demonstrate that Johnson's actions on the day of the incident were all voluntary and not during Hunt Club activities. By virtue of his membership, Johnson had access to the land that he hunted on January 3, 2013. (Johnson Dep. 33:5-25, 37:2-14.) Additionally, Johnson could call on other members to hunt with him on the lands that the Hunt Club owned or leased. (Johnson Dep. 32:19-25, 47:3-13.) On January 3, 2013, Johnson participated in an informal, voluntary hunt. (Johnson Dep. 51:6-23, 52:13-14.) The previous day, another Hunt Club member had contacted Johnson to see if he wanted to hunt. (Johnson Dep. 51:6-23.) Because he had the day off, Johnson ultimately decided that he wanted to hunt. (Johnson Dep. 51:9-13.) Accordingly, he showed up at the prescribed time. (Johnson Dep. 53:7-9.) On January 3, 2013, the voluntary and recreational hunt involved the collective members and guests, and did not constitute a Hunt Club activity under the Endorsement. At no point during that day did Hunt Club activities — such as a workday, meeting or litigating as is the Hunt Club's right under the Virginia Code — occur. [13]

---

[13]     The Court does not address whether the Endorsement would cover a member's liability stemming from a Hunt Club meeting or Hunt Club workday or litigation; however, the Court uses these examples to contrast Hunt Club undertakings for the benefit of the Hunt Club with Johnson's voluntary and individual actions that day.

2. Johnson did not act on behalf of the Hunt Club.

Although the voluntary and recreational hunt was not a Hunt Club activity, the Endorsement could cover Johnson in a second situation. The Endorsement would cover Johnson for his liability for "activities [he] perform[ed] on [the Hunt Club's] behalf." Johnson argues that because the members and guests would have split any meat from the hunt at the close of the day, Johnson acted on behalf of the Hunt Club. (Johnson's Opp'n at 4.) Defendant argues that Johnson did not take directions from the Hunt Club in taking the shot; therefore, he could not have acted on the Hunt Club's behalf. (Scottsdale's Reply to Pls.' Brs. Opp'g Scottsdale's Mot. for Summ. J. ("Def.'s Reply") (ECF No. 45) at 8.)

Although he had been a past-President of the Hunt Club, at the time of the incident, Johnson was not an officer of the Hunt Club. (Johnson Dep. 30:20-22, 32:6-12.) Johnson, therefore, did not act on behalf of the Hunt Club in the myriad of transactions that the Hunt Club entered into as an entity, such as leasing land. (*See* By-Laws ¶¶ II.C.) The parties do not dispute that the Hunt Club did not require that Johnson hunt that day as a condition of membership. (Johnson Dep. 47:17-19; McIver Dep. 35:20-24.) Johnson brought his own firearm and his own ammunition. (Johnson Dep. 53:13-17.) When he went to the woods, he, along with other members of the hunt, decided where to go. (Johnson Dep. 49:16-50:11.) The parties do not dispute that when given the opportunity to shoot a deer, Johnson alone decided to take a shot. (Johnson Dep. 56:7-10.) In taking the shot at issue, Johnson alone decided to pull the trigger. (Johnson Dep. 56:15-57:1.) Thus, it is undisputed that Johnson acted voluntarily and for his own benefit that day and not at the direction, request or benefit of the Hunt Club.

Further, members and guests would have split any meat from a successful hunt and the parties do not dispute that the Hunt Club as an entity would not have received any. (McIver Dep.

20

37:4-39:6; Johnson Dep. 40:2-5.)  Generally, only members and guests present for the hunt would have been entitled to the meat — not necessarily every member of the Hunt Club. (McIver Dep. 37:20-38:6.)  Accordingly, the potential sharing of the fruits of a successful hunt among those who participated or were present — both members and guests alike — does not constitute activity on behalf of the Hunt Club under the Endorsement.

In sum, Johnson's actions that day — deciding to hunt at the outset and pulling the trigger in the end — were completely personal and voluntary, and they were not undertaken on behalf of anyone other than himself, much less the Hunt Club.  Johnson, therefore, fails to satisfy the second scenario for the Endorsement to extend coverage to Johnson.  Accordingly, because Johnson neither participated in Hunt Club activities nor acted on behalf of the Hunt Club that day, the Endorsement does not extend to Johnson in this case.

3. Defendant has no duty to defend Johnson.

Plaintiffs argue that Defendant has a duty to defend Johnson in the underlying negligence action. (Johnson's Mem. at 4-6; Marks' Mem. at 9-11.)  Defendant contends that it owes no duty to defend, because Johnson's actions fall outside of the scope of coverage. (Def.'s Mem. at 16-20.)

Well-established Virginia law directs that "only the allegations in the complaint and the provisions of the insurance policy are to be considered in deciding whether there is a duty on the part of the insurer to defend and indemnify the insured." *AES Corp. v. Steadfast Ins. Co.*, 283 Va. 609, 616-17, 725 S.E.2d 532, 535 (2012).  This "eight corners test" compares the four corners of the complaint with the four corners of the policy "to determine whether the allegations in the underlying complaint come within the coverage provided by the policy." *Id.*  Where at least some of the alleged facts and circumstances would, if proved, "fall within the risk covered

by the policy," the insurance company must defend the insured. *Parker v. Hartford Ins. Co.*, 222 Va. 33, 35, 278 S.E.2d 803, 804 (1981) (quoting *Lerner v. Safeco*, 219 Va. 101, 104, 245 S.E.2d 249, 251 (1978)). However, when it is clear that the insurer would not have been liable under its contract for any judgment based on the allegations, the insurer has no duty to defend. *AES Corp.*, 283 Va. at 617, 725 S.E.2d at 535-36; *Travelers Indem. Co. v. Obenshain*, 219 Va. 44, 46, 245 S.E.2d 247, 249 (1978).

In this case, the undisputed facts make it clear that Defendant bears no liability under the Policy as to Johnson's actions. The Endorsement modifies the Policy to cover member liability for Hunt Club activities or actions taken on behalf of the Hunt Club. (Policy at 27.) As discussed above, the undisputed facts indicate that Johnson's actions satisfy neither requirement; therefore, those actions fall beyond the four corners of the Policy. Accordingly, because Defendant faces no liability under the Policy, Defendant bears no duty to defend Johnson.

## IV. CONCLUSION

In sum, the Court finds that no dispute of material fact exists and that Johnson neither participated in "Hunt Club activities" nor acted "on behalf of the Hunt Club." Rather, Johnson engaged in his own personal, voluntary and recreational pursuits on January 3, 2013. To interpret otherwise would destroy the limiting language of the Endorsement and extend coverage where none was intended. As a result, Johnson was not an insured under the Policy for his activities on January 3, 2013, and Defendant owed Johnson neither coverage nor a duty to defend under the unambiguous terms of the Policy. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 34), DENIES Plaintiff Timothy B. Johnson's Motion

22

for Summary Judgment (ECF No. 30) and DENIES Marks' Summary Judgment Motion (ECF No. 32).

Let the Clerk file this Memorandum Opinion electronically and notify all counsel accordingly.

An appropriate Order shall issue.

                                      /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: July 30, 2014

23